# Exhibit 27

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | |
|---|---|
| ACQIS LLC,<br><br>v.<br><br>ALCATEL-LUCENT USA INC ET AL | CASE NO. 6:13-CV-638<br><br>**PATENT CASE** |
| ACQIS LLC,<br><br>v.<br><br>EMC CORPORATION | CASE NO. 6:13-CV-639<br><br>**PATENT CASE** |
| ACQIS LLC,<br><br>v.<br><br>HUAWEI TECHNOLOGIES CO., LTD.<br>ET AL | CASE NO. 6:13-CV-641<br><br>**PATENT CASE** |

**PLAINTIFF ACQIS LLC'S P.R. 4-5(a) OPENING CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................................... 1

II.    THE PATENTS-IN-SUIT ............................................................................................. 1

III.   THE PRINCIPLES OF CLAIM CONSTRUCTION ...................................................... 3

    A.     Claim Terms are Presumed to Have Their Plain and Ordinary Meaning ............. 3

    B.     The Court Looks First to Intrinsic Evidence to Determine Claim Meaning.......... 4

        1.    The Patent Claims are the Most Important Intrinsic Evidence ................. 5

        2.    The Specification is the Next Best Guide to Claim Meaning.................... 5

        3.    The Prosecution History Only Narrows Claims in Limited
             Circumstances............................................................................................. 5

        4.    Subject Matter Added to the Construction but not in the Claim
             Must Find Support in the Intrinsic Record ............................................... 6

    C.     Extrinsic Evidence, While Sometimes Useful, Cannot Contradict Intrinsic
        Evidence................................................................................................................ 6

IV.    CLAIM TERMS .......................................................................................................... 7

    A.      "low voltage differential signal" / "LVDS"....................................................... 7

    B.     "differential signal … channel" ........................................................................... 9

    C.     "PCI bus . . . transaction" / "Peripheral Component Interconnect (PCI) bus
        transaction" / "(PCI) bus transaction"............................................................... 11

    D.     "encoded PCI bus transaction" / "encoded . . . Peripheral Component
        Interconnect (PCI) bus transaction" / "encoded . . . (PCI) bus transaction"........ 17

    E.     "Ethernet hub controller" .................................................................................. 19

    F.      "computer module" / "module" / "modular computing system" /
        "computer"......................................................................................................... 21

    G.     "connection program" ....................................................................................... 22

    H.     "console"........................................................................................................... 24

    I.     "enclosure"........................................................................................................ 27

    J.     "slot" ................................................................................................................. 28

    K.      "hard disk drive".............................................................................................. 29

V.     CONCLUSION............................................................................................................ 30

# TABLE OF AUTHORITIES

Page

**Cases**

*AFG Indus., Inc. v. Cardinal IG Co., Inc.*,
239 F.3d 1239 (Fed. Cir. 2001).................................................................................10

*Azure Networks, LLC v. CSR PLC*,
771 F.3d 1336 (Fed. Cir. 2014)................................................................................13

*Brita Wasser-Filter-Systeme v. Recovery Eng'G, Inc.*,
2000 U.S. App. LEXIS 23758 (Fed. Cir. Sept. 21, 2000) ..................................9, 12

*Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*,
672 F.3d 1270 (Fed. Cir. 2012)................................................................................26

*EPOS Techs. Ltd. v. Pegasus Techs. Ltd.*,
766 F.3d 1338 (Fed. Cir. 2014)....................................................................15, 17, 21

*Gemstar-TV Guide Int'l, Inc. v. ITC*,
383 F.3d 1352 (Fed. Cir. 2004)........................................................................ *passim*

*Gillette Co. v. Energizer Holdings, Inc.*,
405 F.3d 1367 (Fed. Cir. 2005)..................................................................................4

*Hill-Rom Servs. v. Stryker Corp.*,
755 F.3d 1367 (Fed. Cir. 2014)........................................................................ *passim*

*Liquid Dynamics Corp. v. Vaughan Co.*,
355 F.3d 1361 (Fed. Cir. 2004)..............................................................................4, 5

*Lockheed Martin Corp. v. Space Systems/Loral, Inc.*,
324 F.3d 1308 (Fed. Cir. 2003)................................................................................14

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995)..............................................................................3, 4, 6

*Merck & Co, Inc. v. Teva Pharm. USA, Inc.*,
395 F.3d 1364 (Fed. Cir. 2005)..............................................................................4, 5

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
134 S. Ct. 2120 (2014)..............................................................................................22

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008)..........................................................................3, 4, 27, 29

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Omega Eng'g, Inc. v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003) ...................................................................6, 10

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ..........................................................4, 5, 6, 27

*Power-One, Inc. v. Artesyn Techs.*,
   599 F.3d 1343 (Fed. Cir. 2010) .......................................................................11

*Sparton Corp. v. U.S.*,
   68 Fed. Cl. 34 (2005) .........................................................................................9

*SuperGuide Corp. v. DirecTV Enters., Inc.*,
   358 F.3d 870 (Fed. Cir. 2004) ...........................................................................4

*TDM Am., LLC v. United States*,
   85 Fed. Cl. 774 (Fed. Cl. 2009) ......................................................................14

*Typhoon Touch Technologies, Inc. v. Dell, Inc.*,
   Case No. 6:07-cv-546, 2009 WL 2243126 (E.D. Tex. July 23, 2009) ...................6

*V-Formation, Inc. v. Benetton Group SPA*,
   401 F.3d 1307 (Fed. Cir. 2005) .........................................................................7

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) ...........................................................................4

**Statutes**

28 U.S.C. § 1295(a)(1) .........................................................................................3

35 U.S.C. § 112 ¶ 6 .............................................................................................22

**Other Authorities**

*Computer Desktop Encyclopedia* (1999) .........................................................13, 18

Graf, *Modern Dictionary of Electronics* (7th ed. 1999) ........................................28

*IEEE Standard Dictionary of Electrical and Electronics Terms* (6th ed. 1996) .............18, 28

*The Microsoft Press Computer Dictionary* (1997) .............................................13, 20

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Webster's New World Dictionary of Computer Terms* (5th ed. 1994) ..........................................28

I.      INTRODUCTION

Consistent with the purpose of claim construction – to clarify as needed the meaning of patent claims for a trier of fact – ACQIS seeks a construction for five claim terms in a dispute with eleven asserted patents and 32 asserted claims.

ACQIS's proposed constructions will clarify the meaning of the claims for the jury, while remaining consistent with their plain and ordinary meaning by staying true to the intrinsic record. Defendants' proposed constructions, on the other hand, seek to rewrite the claims to include new concepts, which appear designed to improperly create defenses, rather than clarify claim scope.

Defendants also seek construction of several claim terms, "low voltage differential signal," "differential signal . . . channel," "encoded," "connection program," "enclosure," and "hard disk drive," that require no construction. These claim terms are easily understood by a lay person, yet Defendants propose constructions that deviate from the terms' plain and ordinary meaning, and will confuse the jury. For the reasons set forth below, ACQIS respectfully requests that the Court adopt ACQIS's proposed constructions and reject Defendants' proposals.

II.     THE PATENTS-IN-SUIT

Claim terms from three patent families are before the Court for construction (the "Patents-in-Suit"). Because of the familial relationship and similarity of inventive disclosure, the specifications for the Patents-in-Suit are similar. For ease of reference, ACQIS will use representative cites from the specifications throughout this Brief.

| Family | U.S. Patent No. | Filing Date | Reissue of Patent Filed on: |
|--------|-----------------|-------------|------------------------------|
| '415 family | 7,363,416 ("the '416 Patent") | May 4, 2005 | N/A |
| | 7,676,624 ("the '624 Patent") | March 18, 2008 | |
| | 7,818,487 ("the '487 Patent") | February 11, 2009 | |
| | 8,041,873 ("the '873 Patent") | July 16, 2009 | |
| '335 family | RE41,294 ("the '294 Patent") | May 23, 2006 | October 30, 1998 |
| | RE41,961 ("the '961 Patent") | October 12, 2004 | |
| | RE42,814 ("the '814 Patent") | February 5, 2009 | |
| | RE43,119 ("the '119 Patent") | October 9, 2009 | |
| '777 family | RE43,171 ("the '171 Patent") | October 6, 2006 | May 14, 1999 |
| | RE44,468 ("the '468 Patent") | July 30, 2012 | |
| | RE42,984 ("the '984 Patent") | September 16, 2009 | |

The Patents-in-Suit come from the same families at issue in *ACQIS LLC v. Appro Int'l, Inc.*, No. 6:09-cv-148 (E.D.Tex.).  In that case, this Court construed terms for the following patents:  the '416 Patent (at issue in this case); Patent Nos. 6,718,415; 7,099,981; 7,146,446; 7,328,297; 7,363,415; and 7,376,779 (all part of the '415 family at issue in this case); and Patent No. 6,216,185 (incorporated by reference into both the '777 and '335 patent families at issue in this case).  Sauer Decl.[1], Ex. L, Claim Construction Order, *ACQIS LLC v. Appro Int'l, Inc.*, No. 6:09-cv-148, D.I. 315 (E.D. Tex. Aug. 2, 2010) ("Claim Construction Order").  Because of these familial relationships, the Patents-in-Suit in this case share similar specifications and claim terms with those asserted in the *ACQIS v. Appro* litigation.

The inventions described and claimed in the ACQIS modular computer portfolio address the benefits that may be achieved by using attached computer modules (ACMs) in a console (PCON).  The inventions have several embodiments and may be used as a server, or a portable or

---

[1] All exhibits cited herein are attached to the Declaration of Peter Sauer in Support of Plaintiff ACQIS LLC's P.R. 4-5(a) Opening Claim Construction Brief.

modular desktop computer.  (*See, e.g.*, Ex. D, '873 Patent, col. 1:34-38; Ex. F, '961 Patent, col. 1:35-40; Ex. K, '984 Patent, col. 1:28-32.)  The '873 Patent explains:

> [T]he present invention provides a system including a plurality of computer modules that can independently operate to provide back-up capability, dual processing, and the like.
>
> In a specific embodiment, the present invention provides a computer system for multi-processing purposes.  The computer system has a console comprising a first coupling site and a second coupling site, e.g., a computer bay. Each coupling site comprises a connector.  The console is an enclosure that is capable of housing each coupling site.  The system also has a plurality of computer modules, where each of the computer modules is coupled to one of the connectors. . . .
> . . . .
> Numerous benefits are achieved using the present invention over preexisting techniques.  In one embodiment, the invention provides improved processing and maintenance features.  The invention can also provide increased CPU performance for the whole system.

(Ex. D, '873 Patent, col. 4:10-54.)  The key inventive aspect of the asserted claims of the ACQIS modular patent portfolio is a high-speed, serial PCI communication link that solved important problems resulting from communication bottlenecks in computer design.  (*See, e.g.*, Ex. D, claim 54 of the '873 Patent ("a low voltage differential signal [] channel for communicating an encoded serial bit stream of [] PCI bus transaction.").)  By applying this high-speed link to modular computer systems, the inventions of the Patents-in-Suit allow for, among other things, faster communication speeds, more computing power in less space, and lower power consumption.  (*See, e.g.*, Ex. D, '873 Patent, col. 3:57-67, 24:5-10; Ex. K, '984 Patent, col. 15:41-47, 17:17-32; Ex. J, '468 Patent, col. 15:56-60, 17:31-47.)

## III.    THE PRINCIPLES OF CLAIM CONSTRUCTION

Supreme Court and Federal Circuit precedent control claim construction. 28 U.S.C. 1295(a)(1); *see Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979-81 (Fed. Cir. 1995).

### A.    Claim Terms are Presumed to Have Their Plain and Ordinary Meaning

Claim terms should be "given their ordinary and customary meaning." *O2 Micro Int'l*

*Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008).  Terms that are not unfamiliar or confusing to the jury, or unaffected by the specification or prosecution history, need no construction. *Id.*  The plain and ordinary meaning of claim terms is presumed to apply unless required by (1) an express definition in the specification, or (2) a clear and unmistakable disavowal of the full scope of the claim terms in the specification or the prosecution history. *See Merck & Co, Inc. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1379 (Fed. Cir. 2005). The specification "is not a substitute for, nor can it be used to rewrite, the chosen claim language." *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004). The specification can only alter the plain and ordinary meaning of the claim terms if it "clearly, deliberately, and precisely" defines the subject term. *Merck*, 395 F.3d at 1379; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  Specifications that merely recite examples or embodiments are not sufficient to transform claim terms from their ordinary meaning into more specific usages. *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1373-74 (Fed. Cir. 2005). Courts are not required to construe every word or limitation in the asserted claims of a patent. *O2 Micro*, 521 F.3d at 1360.

### B.      The Court Looks First to Intrinsic Evidence to Determine Claim Meaning

There are two types of evidence commonly used in claim construction—intrinsic evidence and extrinsic evidence. *Markman*, 52 F.3d at 979-81. To construe claims, the Court looks first to intrinsic evidence. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005). Intrinsic evidence is the patent itself, including the claims and specification, and the prosecution history. *Markman*, 52 F.3d at 979.  In construing claims, the Court proceeds through the intrinsic evidence in order of importance, starting with the claims, then the specification, and finally the prosecution history. *Liquid Dynamics Corp. v. Vaughan Co.*, 355 F.3d 1361, 1367 (Fed. Cir. 2004).  Extrinsic evidence, considered last, is everything else. *Vitronics*, 90 F.3d at 1584.

4.

### 1. The Patent Claims are the Most Important Intrinsic Evidence

The claims define the invention and are therefore the primary source of intrinsic evidence for claim construction. *Phillips*, 415 F.3d at 1312; *Liquid Dyn.*, 355 F.3d at 1367. The "claims themselves provide substantial guidance as to the meaning of particular claim terms," as does "the context in which a term is used in an asserted claim." *Phillips*, 415 F.3d at 1314. "As a starting point, [the Court] give[s] claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art." *Liquid Dyn.*, 355 F.3d at 1367 (citation and quotation omitted). Where the claim language is clear and not contradicted by the specification or the file history, the ordinary and customary meanings of the claim terms control. *See id.*

### 2. The Specification is the Next Best Guide to Claim Meaning

While the claims are interpreted in light of the specification, the Court must not read limitations from the specification into the claims. *Hill-Rom Servs. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014). The Federal Circuit has repeatedly warned against reading limitations from the specification into the claims. *Liquid Dyn.*, 355 F.3d at 1369-70. To do so is reversible error. *See id.* (reversing for importing limitations). For example, the disclosure of a narrower embodiment in the specification will not serve to narrow the claims. *Phillips*, 415 F.3d at 1323. Unless the specification "clearly, deliberately, and precisely" spells out how a claim term is to be used, the plain and ordinary meaning of the term controls. *Merck*, 395 F.3d at 1379.

### 3. The Prosecution History Only Narrows Claims in Limited Circumstances

"[T]he prosecution history . . . often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317. The prosecution history can only be used to alter the claim language if it contains a clear disavowal of claim scope. *Hill-Rom*, 755 F.3d at 1371-72. "The standards for finding . . . disavowal are exacting," and require that the

history make clear that the invention does not include a particular feature, or is clearly limited to a particular form of the invention. *Id.*

### 4.      Subject Matter Added to the Construction but not in the Claim Must Find Support in the Intrinsic Record

Where a party seeks to read in a negative claim limitation, the limitation must find support in clear and unmistakable statements in the intrinsic record.  *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325-26 (Fed. Cir. 2003); s*ee also Typhoon Touch Technologies, Inc. v. Dell, Inc.*, Case No. 6:07-cv-546, 2009 WL 2243126, at *3 (E.D. Tex. July 23, 2009) (rejecting a definition that described a term by "what it is not, rather than what it is" where the term was "clearly meant to be broader than this distinction alone."), *rev'd in part on other grounds*, 659 F.3d 1376 (Fed. Cir. 2011).  A party proposing a construction that adds subject matter intended to create a defense, rather than to clarify claim scope must show that the claims, specification, or prosecution history mandate adding the subject matter.  *See Hill-Rom*, 755 F.3d at 1371-72, 1374.

### C.      Extrinsic Evidence, While Sometimes Useful, Cannot Contradict Intrinsic Evidence

Extrinsic evidence includes all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and treatises. *Markman*, 52 F.3d at 980.  A claim term's "ordinary meaning" is not provided by extrinsic evidence; instead, it is found by examining the entire patent, including the specification. *Phillips*, 415 F.3d at 1321.  However, extrinsic evidence can be useful to provide evidence of the understanding of a person of ordinary skill.  *Id.* at 1318.

## IV.    CLAIM TERMS

### A.    "low voltage differential signal" / "LVDS" [2]

| ACQIS's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary.<br><br>To the extent the court determines construction is necessary: "a signal represented by the difference in voltage between two lines, where the difference in voltage is low" | "a generic low voltage differential signal and not limited to any particular type of LVDS technology" |

Nine of the eleven Patents-in-Suit include the terms "low voltage differential signal" or "LVDS" (together "LVDS").  The scope and meaning of these terms is clear and requires no construction.  As shown below, LVDS is a term of art used to describe a type of signaling that was well known, and will be easily understood by one of ordinary skill and the jury.

To the extent the Court determines a construction is necessary, the proper construction is "a signal represented by the difference in voltage between two lines, where the difference in voltage is low."  This construction is consistent with the intrinsic evidence.  For example, the specifications describe differential signaling in terms of two lines carrying a signal:

> In the case of non-differential signal lines, generally only one physical line is used to transmit one signal.  However, in the case of differential signal lines, a pair of physical lines is used to transmit one signal.  For example, a bit line or bit channel in an LVDS or IEEE 1394 interface consists of a pair of physical lines which together transmit a signal.

(Ex. D, '873 Patent, col. 22:16-22.)  Low voltage differential signaling is simply a form of differential signaling where the voltage is low, and was embodied in numerous standards and applications at the time of the invention.  As evidence of this point, the Patents-in-Suit cite to several prior art references that define LVDS, and illustrate the meaning of the term as it was generally used at the time of the inventions.  These references form part of the intrinsic record.

---

[2]"low voltage differential signal" or "LVDS" appears in the following asserted claims: '624:6, 26, 39; '487:38, 45, 49; '873:6, 9, 29, 36, 61, 71; '961:24, 28; '814:24, 31, 37; '119:38, 39, 58; '171:24; '468:29, 30, 37, 45, 47; '984:48, 85

*V-Formation, Inc. v. Benetton Group SPA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005) ("This court has established that prior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence.").   In one example, the 1996 Telecommunications Industry Association Standard describes LVDS as a dual-line channel where each line carries a low voltage, and the potential difference in voltage representing the signal is also low.  (*E.g.*, Ex. D, '873 patent, at 4; Ex. M, TIA/EIA, *Electrical Characteristics of Low Voltage Differential Signaling (LVDS) Interface Circuits*, 2ACQ0111712, at 719, 724, Fig. 1  (Mar. 1996) (describing LVDS as a differential signaling system where the difference between signals is about 330 mV).) In *An Overview of LVDS Technology*—also cited on the face of several patents-in-suit—LVDS "technology uses differential data transmission. . . . as the name implies, LVDS features a low voltage swing compared to other industry data transmission standards."  (Ex. D, '873 patent, at 3; Ex. N, Sayed B. Huq & John Goldie, *An Overview of LVDS Technology*, PR33ACQ0008840, at 840-41 & Fig. 1 (July 1998) (showing a low difference in voltage of only ±400mV).)  These references confirm that LVDS was a well-known and readily understood term, while also supporting ACQIS's construction.

Extrinsic evidence also supports ACQIS's construction.  For example, Texas Instruments described LVDS as "a signaling method used for high-speed, low-power transmission of binary data over copper.   This signaling technique uses lower output-voltage levels than the 5-V differential standards . . . The LVDS current-mode drivers create a differential voltage (247mV 454mV)."   (Ex. O, Texas Instruments, *Interface Circuits for TIA/EIA-644 (LVDS)*, 2ACQ0370109, at 113 (Sept. 2002).)  Based on the above evidence, there is no question that LVDS, as used in the Patents-in-Suit, referred to a widely-known differential signaling technique where the difference in voltage between the two lines is low.

Defendants' construction should be rejected, because it is circular, and fails to clarify "LVDS."  *See Sparton Corp. v. U.S.*, 68 Fed. Cl. 34, 47 (2005) (finding that a construction "that uses the word that it attempts to define in the definition itself" is improper).  Defendants' construction merely repeats "low voltage differential signal" and "LVDS" without offering any explanation for what those phrases or their constituent terms mean.  Furthermore, the negative limitation in Defendants' construction, "not limited to any particular type of LVDS technology," is likely to confuse the jury.   Because the claims themselves limit the application of LVDS technology, i.e., "for communicating an encoded serial bit stream of Peripheral Component Interconnect (PCI) bus transaction," Defendants' proposed construction creates possible inconsistencies in the claims and should be rejected.  *See Brita Wasser-Filter-Systeme v. Recovery Eng'G, Inc.*, 2000 U.S. App. LEXIS 23758, at *11-12 (Fed. Cir. Sept. 21, 2000) (rejecting a proposed construction that was inconsistent with the claim language).  Defendant's construction, therefore, would not clarify the meaning of "low voltage differential signal" for a jury and should be rejected.

### B.    "differential signal . . . channel"[3]

| ACQIS's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary.<br><br>To the extent the court determines construction is necessary:  "a channel for carrying a signal, the signal being represented by the difference in voltage between two lines." | "interface channel that uses differential signaling and operates under a protocol different from that used by the PCI bus" |

"Differential signal . . . channel" is a term having an ordinary and customary meaning understood by those of ordinary skill in the art and lay persons and does not need to be construed.  Nothing in the claims, specification, or prosecution history supports a different

---

[3] "differential signal . . . channel" appears in the following asserted claims: **'416**:51, 60; **'624**:6, 26, 39; **'487**:38, 45, 49; **'873**:6, 9, 29, 36, 61, 71; **'294**:35, 44; **'961**:24, 28; **'814**:24, 31, 37; **'119**:38, 39, 58; **'171**:24; **'468**:29, 30, 37, 45, 47; **'984**:48, 85

meaning.  To the extent the court determines that construction is necessary, "differential signal . . . channel" should be construed as "a channel for carrying a signal, the signal being represented by the difference in voltage between two lines."

ACQIS's proposed construction is supported by both the intrinsic and extrinsic record. As discussed above in connection with the phrase "low voltage differential signal," differential signaling is a well-known method of transmitting information where the signal is represented by the voltage differential between two lines.  *Supra* § IV(A).

Defendants' proposed construction should be rejected, because it (1) creates ambiguity and could be interpreted to conflict with other claim language; (2) improperly includes a negative limitation that has no support in the specifications; and (3) is circular.  First, Defendants' construction includes the limitation "operates under a protocol different from that used by the PCI bus" which could be interpreted to conflict with other limitations of the Asserted Claims. For example, claim 51 of the '416 patent recites a differential signal channel that carries encoded serial PCI bus transaction data and, therefore, operates using a serialized PCI-based protocol. Defendants' construction could be interpreted to conflict with that limitation.  For this reason alone, Defendants' proposed construction should be rejected.  *See AFG Indus., Inc. v. Cardinal IG Co., Inc.*, 239 F.3d 1239, 1241 (Fed. Cir. 2001) (reversing claim construction where it contradicted the manner in which the terms were used in the patent specification).

Second, Defendants' construction improperly includes a negative limitation, "operates under a protocol different from that used by the PCI bus," that is not clearly supported by the intrinsic record and itself requires construction.  *See Omega Eng'g.*, 334 F.3d at 1325-26; *see also Hill-Rom*, 755 F.3d at 1374.  The intrinsic record lacks the requisite clear and unmistakable statements to support adding "operates under a protocol different from that used by the PCI bus"

to the construction of "differential signal . . . channel."

Finally, Defendants' construction improperly relies on a circular definition.  Defendants use the terms "differential signaling" and "interface channel" to define the term "differential signal channel."  As was the case with "LVDS," Defendants' definition does not simplify the meaning of "differential signal channel" for a jury, nor does it clarify the terms in question.  *See Power-One, Inc. v. Artesyn Techs.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) ("The terms, as construed by the court, must ensure that the jury fully understands … what the patentee covered by the claims").  Defendants' construction should therefore be rejected.

### C.      "PCI bus . . . transaction" / "Peripheral Component Interconnect (PCI) bus transaction" / "(PCI) bus transaction"[4]

| ACQIS's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "digital command, address, and data information, in accordance with the PCI standard, for communication with an interconnected peripheral component" | "signals communicated over a 'PCI bus'"<br><br>Upon incorporating agreed construction for "PCI bus": "signals communicated over an industry standard computer bus known as the Peripheral Component Interconnect Local Bus" |

"PCI bus transaction" was previously construed by the Court in the *ACQIS v. Appro* litigation. (Ex. P, Second Claim Construction Order, No. 6:09-cv-148, D.I. 602 at 7-11 (E.D. Tex. Feb. 3, 2011) (construing PCI bus transaction as "a data signal communication with an interconnected peripheral component.") ("Second Claim Construction Order").)[5]  As set forth below, ACQIS respectfully submits that this construction should be reconsidered.  In this case, although the parties disagree on the ultimate construction of "PCI bus transaction," the parties do agree that "PCI" means "an industry standard computer bus known as the Peripheral Component

---

[4] "PCI bus . . . transaction" or "Peripheral Component Interconnect (PCI) bus transaction" or "(PCI) bus transaction" appears in the following asserted claims: **'416**:51, 60; **'624**:6, 26, 39; **'487**:38, 45, 49; **'873**:6, 9, 29, 36, 61, 71; **'294**:35, 44; **'961**:24, 28; **'814**:24, 31, 37; **'119**:38, 39, 58; **'171**:24; **'468**:29, 30, 37, 45, 47; **'984**:48, 85

[5] This court construed "PCI bus transaction" for the previous litigation for the following patents:  the '416 Patent (at issue in this case); and Patent Nos. 7,363,415, and 7,376,779 (both are members of the '415 family at issue in this case).

Interconnect Local Bus."  (P.R. 4-3 Joint Claim Construction Statement, D.I. 114, Ex. 1 at 1.) The parties also agree that the prior construction was incorrect because it did not account for the PCI standard.  (*See id.* at 3.)

ACQIS's construction will clarify the meaning of "PCI bus transaction" and is consistent with the understanding of one of ordinary skill in the art.  On the other hand, Defendants' construction improperly adds limitations into the claims for the purpose of creating an invalidity defense, and renders certain claims inoperable.  *See Hill-Rom*, 755 F.3d at 1374; *Brita Wasser-Filter-Systeme v. Recovery Eng'G, Inc.*, 2000 U.S. App. LEXIS 23758, at *11-12 (Fed. Cir. Sept. 21, 2000) (rejecting a proposed construction where it was inconsistent with the claim language).

With respect to the Court's prior construction, the parties agree that any construction of the term "PCI bus transaction" must account for the PCI standard, and cannot refer to a generic transaction. (P.R. 4-3 Joint Claim Construction Statement, D.I. 114, Ex. 1 at 1.)  Incorporating the PCI standard into the construction is supported by intrinsic and extrinsic evidence.

First, the claims themselves expressly define "PCI" as "Peripheral Component Interconnect."  (*See, e.g.*, Ex. D, '873 Patent, claim 54 ("encoded serial bit stream of Peripheral Component Interconnect (PCI) bus transaction.").)  By virtue of the express definition of "PCI" in the claims, it must be narrower than some generic bus transaction.

ACQIS's proposed construction and the inclusion of "in accordance with the PCI standard," is also consistent with the specifications of the Patents-in-Suit.  For example, in one embodiment, the '873 Patent describes PCI "bus transactions" generated according to the PCI standard and serialized for transmission over a low-voltage differential signal channel.  Indeed, one of the goals of the invention is to serialize PCI standard signals specifically, not some generic signal or alternative, as described in the specification:

> In the present invention, PCI control signals are encoded into control bits and the control bits, rather than the control signals that they represent, are transmitted on the interface channel. At the receiving end, the control bits representing control signals are decoded back into PCI control signals prior to being transmitted to the intended PCI bus.

(Ex. D, '873 Patent, col. 5:33-39; *see also* Ex. K, '984 Patent, col. 17:5-10; Ex. J, '468 Patent, col. 17:19-24.)

ACQIS's inclusion of "in accordance with the PCI standard" in its proposed construction is also supported by extrinsic evidence.  In particular, technical dictionaries consistently define the acronym "PCI" as relating to the PCI standard.  For example, the *Computer Desktop Encyclopedia* (1999) defines "PCI" as "(Peripheral Component Interconnect) [a] peripheral bus commonly used in PCs, Macintoshes and workstations."  (Ex. Q, 2ACQ0356059, at 64-65; *see also* Ex. R, *The Microsoft Press Computer Dictionary*, 2ACQ0356050, at 56-57 (1997) ("PCI local bus. . . . Short for Peripheral Component Interconnect local bus.").)  The consistent treatment given to "PCI" from extrinsic evidence shows that ACQIS's proposed construction for "PCI bus transaction" should refer to a bus transaction "in accordance with the PCI standard."

The Federal Circuit has also interpreted well-known industry acronyms according to their plain and ordinary meaning.  *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1348-50 (Fed. Cir. 2014) (reversing construction of "MAC address" that differed from the industry-understood meaning of "MAC" or "Media Access Control").  Similarly, "PCI bus transaction" should be limited to a bus transaction according to the PCI standard.  To attribute some meaning to "PCI bus transaction" broader than a bus transaction in accordance with the peripheral component interconnect standard, the specification must deliberately, clearly, and precisely set forth the broader meaning.  *Id.*  The specification does not do so here.

Finally, if the construction of "PCI bus transaction" does not require a transaction in

compliance with the PCI standard, then the construction would improperly read out the express definition of "Peripheral Component Interconnect" from the claims. *Lockheed Martin Corp. v. Space Systems/Loral, Inc.*, 324 F.3d 1308, 1319 (Fed. Cir. 2003) (reversing the district court's claim construction where it improperly broadened the function of a limitation by "reading out the remaining claim limitations"); *TDM Am., LLC v. United States*, 85 Fed. Cl. 774, 787 (Fed. Cl. 2009) ("[T]he court cannot construe claims to read an express limitation or element out of the claims.").

What the parties do dispute, however, is whether a "PCI bus transaction" as used in the asserted claims, refers to: (1) the information contained in a PCI bus transaction, as ACQIS argues, or (2) an actual transaction conducted over a PCI bus, as Defendants argue.  As shown below, the intrinsic evidence supports ACQIS's proposed construction of "PCI bus transaction." The asserted patent specifications make clear that "PCI bus transaction" refers to specific underline information content according to the PCI standard.  And a person of ordinary skill would understand that the information transmitted in a "PCI bus transaction" includes the command, address, and data underline information required of a PCI-standard based transaction, as ACQIS's construction describes.  "PCI bus transaction" is the information transacted, not the wires over which the transaction is conveyed.

According to the '873 Patent, for example, the specific information required for a PCI bus transaction, includes "command, address, and data information."  (Ex. D, '873 Patent, col. 17:41-43.) '873 Patent, Figure 10 relates to a PCI bus transaction and illustrates the required command, address, and data information portions of a "PCI bus transaction."  (Ex. D, '873 Patent, Fig. 10.)  In describing the embodiment disclosed by Figure 10, the specification states that the "[t]ransmitter 1030 receives multiplexed parallel address/data (A/D) bits and control bits

from translator 1020 on the AD[31::0] out and the CNTL out lines, respectively." (Ex. D, '873 Patent, col. 17:41-43 (emphasis added); *see also* Ex. G, '814 Patent, col. 21:51-52; Ex. I, '171 Patent, col. 16:1-3.)

The specifications' description of the address, data, and control bits mirrors the description of PCI bus transaction as explained in the *PCI Local Bus Specification*. (Ex. S, 2ACQ0356661, at 712.)  The *PCI Local Bus Specification* is cited on the face of many of the Patents-in-Suit.  (*See* Ex. C, '487 Patent, at 5; Ex. D, '873 Patent, at 3; Ex. F, '961 Patent, at 4; Ex. G, '814 Patent, at 6; Ex. I, '171 Patent, at 5; Ex. K, '984 Patent, at 4.)  In the *PCI Local Bus Specification* "Bus Transactions," are described as having an address phase and data phase "**AD[31::00]**" and a command, or control, phase "**C/BE[3::0]#**," just as they are described in the specifications of the Patents-in-Suit.  (Ex. S, 2ACQ0356661, at 712; Ex. D, '873 Patent, col. 20:45-47 ("The bits transmitted on lines PD0 to PD3 represent 32 PCI **AD[31::0]** signals, 4 PCI **C/BE# [3::0]** signals.") (emphasis added).)  The specification and other intrinsic evidence all consistently require a "bus transaction" of the PCI standard to require "command, address, and data information."  The specifications clearly show that a PCI bus transaction, as used in the Patents-in-Suit, is <u>information</u> that represents the requisite address, data, and control information described in the PCI standard, as ACQIS's construction properly accounts for.

Defendants' proposed construction should be rejected, because Defendants seek to add a limitation where none is claimed; restricting "PCI bus transactions" to only those transactions crossing over a physical PCI bus.  A PCI bus requires parallel transmission, and adopting Defendants' construction would render some of the claims and embodiments described in the specification inoperable.  "A claim construction that excludes a preferred embodiment is rarely, if ever correct and would require highly persuasive evidentiary support."  *EPOS Techs. Ltd. v.*

15.

*Pegasus Techs. Ltd.*, 766 F.3d 1338, 1347 (Fed. Cir. 2014) (reversing the district court's claim

construction because it read out a preferred embodiment). For example, claim 24 of the '171

Patent claims:

> an integrated interface controller and bridge unit to output an encoded serial bit
> stream of address and data bits of Peripheral Component Interconnect (PCI)
> bus transaction, the integrated interface controller and bridge unit coupled to
> the central processing unit <u>without any intervening PCI bus</u>
> a low voltage differential signal channel coupled to the integrated interface
> controller and bridge unit <u>to convey the encoded serial bit stream of PCI bus
> transaction</u>

(Ex. I, '171 Patent, claim 24 (emphasis added); *see also* Ex. D, '873 Patent, col. 43:50-52; *see*

*also* Ex. H, '119 Patent, claims 38, 58; Ex. J, '468 Patent, claims 29, 30, 37, 45, 47; Ex. I, '171

Patent, claims 24; Ex. G, '814 Patent, claims 24, 31, 37.)  As shown, Claim 24 claims a system

that does not utilize a PCI bus; the system conveys the information of the "bus transactions" of

the "PCI standard" across a low voltage differential signal channel in serial form.  Because this

transmission is made in serial form over an LVDS channel, the transaction cannot be "over a PCI

bus" as proposed by Defendants.   The claims and specifications show that a "PCI bus

transaction" is **not limited** to being conveyed "over a PCI bus."   (*Id.*; *see also* Ex. A, '416

Patent, Fig. 8 and accompanying text; Ex. J, '468 Patent, Figs. 18 – 20 and accompanying text.)

Instead "PCI bus transaction" merely refers to the information required by the PCI standard in

order to create a PCI communication, *i.e.*, "digital command, address, and data information, in

accordance with the PCI standard, for communication with an interconnected peripheral

component."

Additional claim language refutes Defendants' proposed construction.   While not

asserted in ACQIS's narrowed claims, claim 28 of the '171 Patent shares the same terms and is

part of the intrinsic record.  It claims:  "The method of claim 27 wherein conveying the encoded

serial bit stream of PCI bus transaction comprises conveying information to permit decoding **to create a PCI bus transaction across the [LVDS] channel.**"   (Ex. I, '171 Patent, claim 28 (emphasis added).)   If Defendants' construction is adopted, this claim would be rendered inoperable because (1) the claim does not include a PCI bus, and (2) the claim expressly describes a PCI bus transaction occurring over an LVDS channel, not a PCI bus.  (*Id.*)

Defendants' proposed construction shows that they seek to read into the claims additional limitations designed to improperly create defenses, rather than to clarify claim scope.  *See Hill-Rom*, 755 F.3d at 1374.  Contrary to Federal Circuit law, defendants' construction improperly reads out claim 24 of the '171 Patent, an embodiment described in the specification.  *See, e.g.*, *EPOS Techs.*, 766 F.3d at 1347.  The claims and the specification do not support deviating from the plain and ordinary meaning, which is reflected in ACQIS's proposed construction.  Accordingly, Defendants' proposed construction should be rejected.

### D.      "encoded PCI bus transaction" / "encoded . . . Peripheral Component Interconnect (PCI) bus transaction" / "encoded . . . (PCI) bus transaction"[6]

| ACQIS's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| ACQIS incorporates construction of "PCI bus transaction" above.  The term "encoded" needs no construction.<br><br>To the extent the Court determines a construction is necessary, "encoded …bus transaction" should be construed as "assigning code to represent data for a bus transaction." | Defendants incorporate construction of "PCI bus transaction" above.<br><br>"'PCI bus transaction' translated into bits for parallel to serial conversion" |

As both of the constructions proposed by the parties incorporate their respective asserted constructions of "PCI bus transaction," the term at issue here is "encoded."  Construction of this term is unnecessary as it has the plain and ordinary meaning known to a person skilled in the art.

---

[6] "encoded PCI bus transaction" or "encoded . . . Peripheral Component Interconnect (PCI) bus transaction" or "encoded . . . (PCI) bus transaction" appears in the following asserted claims: **'416**:51, 60; **'624**:6, 26, 39; **'487**:38, 45, 49; **'873**:6, 9, 29, 36, 61, 71; **'294**:35, 44; **'961**:24, 28; **'814**:24; **'119**:38, 39; **'171**:24; **'468**:29, 30, 37, 45, 47; **'984**:48, 85

To the extent the court determines that construction of the term is necessary, "encoded . . . bus transaction" should be construed as "assigning code to represent data for a bus transaction."  The specification of the '873 Patent details the encoding process:

> [C]ontrol signals are encoded into control bits and the control bits, rather than the control signal that they represent, are transmitted on the interface channel.  At the receiving end, the control bits representing control signals are decoded.

(Ex. D, '873 Patent, col. 5:34-38; Ex. E, '294 Patent, col. 11:37-41; Ex. J, '468 Patent, col. 17:19-24.)    The specification offers further support and defines the necessary scope of the term "encoded" in its discussion of the purpose of assigning "bits" or "code" to represent the signal:

> The fact that control bits rather than control signals are transmitted on the interface channel allows using a small number of signal channels and a correspondingly small number of conductive lines in the interface channel than would otherwise be possible. . . . This relatively small number of signal channels used in the interface channel allows using LVDS channels for the interface.

(Ex. D, '873 Patent, col. 5:40-48; Ex. E, '294 Patent, col. 11:43-52; Ex. J, '468 Patent, col. 17:25-33) (emphasis added).)

ACQIS's proposed construction is further supported by technical dictionaries that are evidence of the understanding of a person of ordinary skill.  For example, *The Computer Desktop Encyclopedia* (1997) defines encode as, "to assign a code to represent data, such as a parts code.  Contrast with *decode*."  (Ex. Q,  2ACQ0356059, at 63.)  In another example, *The IEEE Standard Dictionary of Electrical and Electronics Terms* (1996) defines encode as, "[t]o express a single character or a message in terms of code."  (Ex. T, ACQISDEF-4-2 0000344, at 351.)

Defendants' proposed construction should be rejected, because it seeks to read a new limitation into the claim language, requiring that encoding be done for parallel to serial conversion.  *Gemstar-TV Guide Int'l, Inc. v. ITC*, 383 F.3d 1352, 1368-69 (Fed. Cir. 2004) (finding error in the ITC's claim construction where it read particular limitations from the

specification into the claims).  The claim language, while expressly discussing the encoded nature of the PCI bus transaction, does not claim parallel to serial conversion.  Furthermore many claims specifically limit the invention to one without any "intervening PCI bus," claim 24 of the '171 Patent for example, so the serial PCI bus transaction must originate in serial form, and no parallel to serial conversion can occur.  (Ex. I, '171 Patent, claims 24; *see also* Ex. D, '873 Patent, claim 61, Fig. 8; Ex. H, '119 Patent, claims 38, 58; Ex. J, '468 Patent, claims 29, 30, 37, 45, 47, Figs. 18, 20; Ex. G, '814 Patent, claims 24, 31, 37.)  For this, and other claims, Defendants' proposed construction would improperly read a limitation from the specification into the claims, requiring that the encoding be done "for parallel to serial conversion," even where no such parallel to serial conversion occurs.  *Gemstar-TV*, 383 F.3d at 1368-69.

In another example, claim 37 of the '468 patent, the processor is directly coupled to the LVDS channel.  (Ex. J, '468 patent, claim 37 ("A computer comprising: a central processing unit directly connected to a first [LVDS] channel to convey a first encoded serial bit stream of address and data bits pf a [PCI] bus transaction.").)  As with claim 24 of the '171 patent discussed above, no parallel to serial translation can occur prior to sending the PCI bus transaction over the LVDS channel because a parallel PCI bus cannot exist on a processor.  If Defendants' construction were adopted, claim 37 would be impracticable.  Accordingly, because Defendants' proposed construction attempts to read a new limitation into the claim language it must be rejected.

E.    "Ethernet hub controller"[7]

| ACQIS's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "Ethernet device joining communication lines at a central location, providing a common connection to all devices on the network" | "a console component providing a central connection between Ethernet communication devices in which a transmission from any one device is received by all other devices" |

---

[7] "Ethernet hub controller" appears in the following asserted claims: **'416**:51, 60; **'873**:9

The term "Ethernet hub" should be given its plain meaning in view of the patent specifications and other intrinsic evidence.  The term, "controller" does not require construction as it has the plain and ordinary meaning known to a person skilled in the art.  Consistent with both these approaches, and relying on the intrinsic evidence, this Court previously construed "Ethernet hub controller" to mean an "Ethernet device joining communication lines at a central location, providing a common connection to all devices on the network."  (Ex. P, Second Claim Construction Order at 5-7.)[8]  ACQIS argues for the previously-ordered construction, rather than an alternative construction that improperly limits the claims, like Defendants' proposal.

The specification and claims of the asserted patents disclose that an Ethernet hub provides a common communications link to the connected devices.  For example, the '873 specification states:  "The Ethernet Hub Controller provides the high-speed communication function between the two computer modules." (Ex. D, '873 Patent, col. 11:48-50.)

Defendants' proposed construction should be rejected because it excludes an embodiment disclosed in the specification.  The '873 Patent states: "The [system] design . . . can be implemented with the use of multi-port, serial communication hub controller and multi-port I/O switches."  (*Id.* at col. 14:1-3.)  The prosecution history of a related patent describes Ethernet hub controllers: "the various types of Ethernet hub controllers (e.g. switching hub, passive hub or intelligent hub) require computer modules to communicate to the hub controller through separate and distinct Ethernet connections."  (*See* Ex. U, 7,328,297 FH, Response to Feb. 8, 2007 Office Action, at 24, 2ACQ0016042, at 65.)  The suggested use of a switching hub controller in this embodiment allows transmissions to be sent to their intended destination, rather than all devices. (*See* Ex. V, *Extending Ethernets with Hubs, Quick Reference Guide to the Ethernet System*

---

[8] This court construed "hub controller" for the previous litigation for the following patents:  the '416 Patent (at issue in this case); Patent Nos. 7,363,415, and 7,376,779 (part of the '416 family at issue in this case).

(1995), 2ACQ0307142 ("There are two major kinds of hubs: repeater hubs and switching hubs."); Ex. W, *Microsoft Press Computer Dictionary* (3d ed. 1997), 2ACQ0307126, at 134 (defining "Switching Hub" as "a central device (switch) that connects separate communication lines in a network . . . . The switch functions as a hub, or PBX, for the network.").) Therefore, Defendants' proposal that "hub controller" require that the transmission be received by all other devices would improperly limit the claim scope and effectively write out a specific embodiment in the specification. *See EPOS Techs.*, 766 F.3d at 1347 (reversing the district court's claim construction because it read out a preferred embodiment).

F.     "computer module" / "module" / "modular computing system" / "computer"[9]

| ACQIS's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "computer module" means "an assembly for providing a computing function within a computer system as recited in a particular claim."<br><br>Construction of the terms "module" or "modular computing system" or "computer" is unnecessary as they have the plain and ordinary meaning known to a person skilled in the art. | "a removable, user-portable computing package" |

The term "computer module" is a simple term that should be given its plain meaning in view of the patent specifications and other intrinsic evidence.  The terms, "module," "modular computing system," and "computer" do not require construction as they have the plain and ordinary meaning known to a person skilled in the art.  Consistent with this approach, this Court previously construed "computer module" to mean "an assembly for providing a computing function within a computer system as recited in a particular claim." (Ex. L, Claim Construction

---

[9] "computer module" or "module" or "modular computing system" or "computer" appears in the following asserted claims: **'416**:51, 60; **'624**:6, 26, 39; **'487**:38, 45, 49; **'873**:6, 9, 29, 36, 61, 71; **'294**:35, 44; **'961**:24, 28; **'814**:24, 31, 37; **'119**:38, 39, 58; **'171**:24; **'468**:29, 30, 37, 45, 47; **'984**:48, 85

Order, at 6-8.)[10]  ACQIS argues for the previously-ordered construction.

Like the Defendants in this case, the defendants in the *ACQIS v. Appro* litigation argued that "computer module" should be construed to include a size limitation, *i.e.*, "user-portable." This court rejected that argument, pointing out that the patent examiner had not required the patentee to include any size limitations in the claims to make them patentable.  (Ex. L, Claim Construction Order, at 7.)  The Court reasoned that this demonstrates that the invention is focused more on the separability of and interconnection between the ACM and PCON units, rather than the portability and size of the ACM.  *Id.*  Therefore, Defendants' proposed construction limiting "computer modules" to those that are user-portable should be rejected.

### G.    "connection program"[11]

| ACQIS's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| ACQIS disputes Defendants' contention that this claim term is governed by 35 U.S.C. 112 ¶ 6<br><br>No construction necessary.<br><br>To extent Court determines that construction of this term is necessary, "connection program" should be construed as "a program that connects one piece of hardware or software to another." | The "connection program" term renders claims 24 and 29 of the '171 patent invalid for indefiniteness because, among other reasons:<br><br>(1) The terms are subject to the provisions of 35 U.S.C. § 112 ¶ 6 (pre-AIA) and the specification fails to disclose corresponding structure.<br><br>For claim 24 of the '171 patent:<br>**Function:** "to adapt to the connection information"  **Structure:** not disclosed<br><br>(2) The claim terms, read in light of the specification and file history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention, as required by *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014). |

The term "connection program" is subject to Defendants' request to file a Motion for

---

[10] This court construed "computer module" for the previous litigation for the following patents:  the '416 Patent (at issue in this case); Patent Nos. 6,718,415, 7,099,981, 7,146,446, 7,328,297, 7,363,415, and 7,376,779 (part of the '416 family at issue in this case); Patent No. 6,216,185 (incorporated by reference into both the '777 and '335 patent families at issue in this case).

[11] "connection program" appears in the following asserted claim: **'171**:24

Partial Summary Judgment of Indefiniteness, and arguments related to indefiniteness, including whether this claim is governed by 35 U.S.C. § 112 ¶6, will be addressed in that briefing.  (D.I. 126.)

"Connection program" is a term that requires no construction because it has a plain and ordinary meaning known to one skilled in the art and to a lay juror.  The specification confirms that the plain and ordinary meaning of "connection program" is intended.  (Ex. I, '171 Patent, col. 13:23-25 ("[S]oftware in attached computer module can read and allow a connection to a network.");  col. 13:33-36 ("The module then asks the console which hardware will be used.  If the hardware is an Ethernet connect, the module configures connection information to access the Ethernet connection.").)   To the extent the Court determines a construction is needed, "connection program" should be construed as "a program that connects one piece of hardware or software to another," which is consistent with the plain meaning of the term.   Both the claims and the specification support this construction.

First, this construction is supported by the clear language of the claims.  Claim 24 of the '171 Patent states:

> A method comprising: providing a computer module the module comprising . . . a connection program . . . receiving connection information from the computer console; configuring the connection program to adapt to the connection information, and establishing a connection between the computer modules and a server coupled to the network.

(Ex. I, '171 Patent, claim 24.)  A "connection program" connects the module to the server after receiving connection information from the console and configuring the program to adapt to the information received.  The "connection program" is not limited to a specific type; rather, it describes a class of programs that will be able to receive information regarding what type of connection is appropriate and connect one piece of hardware or software to another according to

that information.

The specification further supports that this construction comports with the plain meaning. The specification describes how the connection program works:

> Each console provides a selected connection based upon set of predefined factors. These factors include communication hardware information **so that software in attached computer module can read and allow a connection to a network**.

(*Id.* at col. 13:22-25 (emphasis added).)   In establishing this connection, the specification describes an embodiment to show the method of the "connection program":

> In a specific embodiment, the module inserts into the console.  The module then asks the console which hardware will be used.  **If the hardware is an Ethernet connect, the module configures connection information to access the Ethernet connection.  Alternatively, if the hardware requires a DSL connection, the module configures connection information to access the DSL connection**.

(*Id.* at col. 13:33-38 (emphasis added).)   As is made clear by the specification, the claimed "connection program" describes software that determines what type of hardware resides in the console based on information provided by the console, and then uses that information to establish a connection.   Accordingly, the term needs no construction.   Should the Court determine that a construction is needed, "connection program" should be construed as "a program that connects one piece of hardware or software to another."

### H.      "console"[12]

| ACQIS's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a chassis that connects several components of the computer system" | "a device that supplies a module with a primary input, display, and power supply to form an operating computer system" |

The term "console" is a term juries would understand for its plain meaning in view of the patent specifications and other intrinsic evidence. Consistent with this approach, the term

---

[12] "console" appears in the following asserted claims: **'416**:51, 60; **'624**:6, 26, 39; **'487**:38, 45, 49; **'873**:6, 9, 29, 36, 61, 71; **'961**:24, 28; **'814**:24, 31, 37; **'119**:38, 39, 58; **'171**:24; **'468**:29, 30; **'984**:48, 85

"console" is properly construed to mean "a chassis that connects several components of the computer system."  This is also the construction ordered by the District Court during previous litigation.  (Ex. L, Claim Construction Order, at 8-9.)[13]

Defendants' proposed construction attempts to read a limitation from a preferred embodiment into the claims, contrary to claim construction precedent.  *Gemstar-TV*, 383 F.3d at 1368-69.  The Patents-in-Suit uniformly teach that a console is a chassis that provides a "connection" either expressly or inherently to one or more computer modules.  For example, the '487 Patent teaches:

> In a specific embodiment, the present invention provides a computer system for multi-processing purposes.  The computer system has a **console** comprising a first coupling site and a second coupling site, e.g., computer module bay.  Each coupling site comprises a connector.  The **console is an enclosure that is capable of housing each coupling site.** The system also has a plurality of computer modules, where each of the computer modules is coupled to one of the connectors.

(Ex. C, '487 Patent, col. 4:13-20 (emphasis added).)

The asserted claims teach and use "console" in the same way.  (*See, e.g.*, Ex. A, '416 Patent, claim 51 ("a console comprising . . . a first coupling site and a second coupling site, each coupling site comprising a connector . . . the console being an enclosure"); Ex. B, '624 Patent, claim 6 (reciting that a console comprises "a first coupling site and a second coupling site; each coupling site comprising a connector . . . the console being an enclosure housing the coupling sites"); Ex. C, '487 Patent claim 39 (same).)

---

[13] This court construed "console" for the previous litigation for the following patents:  the '416 Patent (at issue in this case); Patent Nos. 6,718,415, 7,099,981, 7,146,446, 7,328,297, 7,363,415, and 7,376,779 (part of the '416 family at issue in this case); Patent No. 6,216,185 (incorporated by reference into both the '777 and '335 patent families at issue in this case).

Defendants' proposed construction should be rejected because it reads limitations from preferred embodiments into the claims and renders language of other claims superfluous.  For example, Claim 1 of the '873 Patent claims:

> a console comprising
>> a plurality of coupling sites,
>> a serial communication hub controller, and
>> an enclosure housing the coupling sites and the serial communication hub
>>> controller;

(Ex. D, '873 Patent, claim 1.)  In comparison, Claim 11 of the '873 Patent claims:

> a console comprising
>> a plurality of coupling sites, each of the coupling sites comprising a slot,
>> **a power supply**, and
>> an enclosure housing the coupling sites and the power supply;

(Ex. D, '873 Patent, claim 11.)  Defendants' requirement that the term "console" include the requirement of supplying a power supply would render Claim 11's additional language superfluous.  *See Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1275 (Fed. Cir. 2012) (rejecting a construction that would render language in many of the claims superfluous, because "claims are interpreted with an eye toward giving effect to all terms in the claim.").  If the console had to provide a power supply, as the Defendants suggest, there would be no reason to include power supply as an additional limitation.  Defendants' construction would effectively rewrite the claim language, such that the portions of the above claims would become identical.

The specifications of the Patents-in-Suit also support this construction of the claim language. For example, the '873 Patent teaches that:

> [t]he ACM connects to the console, which has at least the following elements, which should not be limiting.
>   1) **Connection to** input devices, e.g. keyboard or mouse;
>   2) **Connection to** display devices, e.g. Monitor;
>   3) Add-on **means**, e.g. PCI add-on slots . . . .

(Ex. D, '873 Patent, col. 34:32-37 (emphasis added).)  In stating that the console may include a connection to the input and display devices, or a means to add on devices, it is clear that the specification teaches an embodiment that does not necessarily supply the computer module with those devices.  Defendants' construction would improperly exclude this embodiment.

ACQIS's proposed construction of "console" as "a chassis that connects several components of the computer system" is consistent with the clear language of the claims, the embodiments described in the asserted patents, the plain and ordinary meaning of the term, and this Court's prior construction.  Under *Phillips*, this construction should be adopted.  *Phillips*, 415 F.3d at 1316.

### I.  "enclosure"[14]

| ACQIS's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| No construction necessary as it has the plain and ordinary meaning known to a person skilled in the art. | "a surrounding case that protects internal components from mechanical and environmental exposure" |

"Enclosure" is a term that requires no construction—it is a plain and ordinary term that a lay jury will easily be familiar with from everyday knowledge.  *O2 Micro*, 521 F.3d at 1360 (finding that no construction is necessary where terms are readily understandable to a lay jury). In the Patents-in-Suit, "enclosure" is used to refer to the structure that encloses both the console and the ACM.   (*E.g.*, Ex. D, '873 Patent, col. 4:21-22 ("The console is an enclosure that is capable of housing each coupling site."); col. 9:41-56 ("[T]he ACM includes an enclosure such as the one described with the following components, which should not be limiting.").)  Because the meaning and scope of "enclosure" are clear and unambiguous, no construction is needed. *See O2 Micro*, 521 F.3d at 1360.

---

[14] "enclosure" appears in the following asserted claims: **'416**:51, 60; **'624**:6, 26, 39; **'487**:38, 45, 49; **'873**:6, 9, 36, 71; **'961**:24; **'814**:37; **'119**:58

Defendants' proposed construction creates ambiguity in the claims and seeks to improperly read an embodiment into the claims. *See Gemstar-TV*, 383 F.3d at 1368-69. Regarding the "enclosure" of both the computer module and the console, Defendants attempt to read preferred embodiments into the limitation that describe a protective enclosure. In one embodiment the '873 specification discloses a module enclosure that is "preferably constructed of a strong, light-weight rigid material that will protect the internal components from mechanical and environmental exposure." (Ex. D, '873 Patent, col. 27:6-8.) In another embodiment, the '873 specification teaches that "[w]hile many physical arrangements between the ACM and PCON are possible, the use of an enclosed computer bay as the one illustrated in Fig. 20b offers many advantages. For example, the illustrated computer bay provides physical protection for the ACM." (Ex. D, '873 Patent, col. 28:12-17.) But nothing in the claim language or specification suggests that an enclosure is required to have these characteristics.

To the extent the Court finds extrinsic evidence helpful to construe the term, technical dictionaries also show that the plain and ordinary meaning of "enclosure" does not necessarily include a protective element. (Ex. T, *IEEE Standard Dictionary of Electrical and Electronics Terms*, ACQISDEF4-200000344, at 355 (6th ed. 1996) ("enclosure . . . (4) An identifiable housing, such as a cubicle, compartment, terminal box, panel, or enclosed raceway, used for electrical equipment or cables"); Ex. X, Graf, *Modern Dictionary of Electronics*, ACQISDEF4-2 0000376, at 380 (7th ed. 1999) ("enclosure 1 . . . also any cabinet for a component, electrical, or electronic device."); Ex. Y, *Webster's New World Dictionary of Computer Terms*, 2ACQ0377599, at 601 (5th ed. 1994) ("Enclosure the housing for any electrical or electronic device.").)

**J.    "slot"[15]**

| ACQIS's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a space for receiving a computer module" | "a space that receives a module and guides the module into place" |

The term "slot" is an uncomplicated term juries would understand for its plain meaning in view of the patent specifications and other intrinsic evidence. Consistent with this approach, this Court previously construed "slot" to mean "a space for receiving a computer module." (Ex. L, Claim Construction Order, at 10-11.)[16] ACQIS argues for the previously-ordered construction.

Defendants cite to Figure 1 and the accompanying text, which is common to the Patents-in-Suit incorporating this term. (P.R. 4-3 Joint Claim Construction Statement, D.I. 114, Ex. 1 at 32-34.) The text accompanying Figure 1 states, "FIG. 1 is *a simplified diagram* of a computer system according to an embodiment of the present invention. . . . One of ordinary skill in the art would recognize other variations, modifications, and alternatives." (Ex. D, '873 Patent, 8:51-56.) Defendants' construction improperly defines claim language based on one embodiment of the invention and should be rejected. *Gemstar-TV*, 383 F.3d at 1368-69.

**K.    "hard disk drive"[17]**

| ACQIS's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary as it has the plain and ordinary meaning known to a person skilled in the art. | "a device that stores data on one or more spinning, rigid magnetic disks" |

"Hard disk drive" is a term that requires no construction—it is a plain and ordinary term that a lay jury will easily be familiar with from everyday use of a computer system. Because the meaning and scope of "hard disk drive" are clear and unambiguous, no construction is needed.

---

[15] "slot" appears in the following asserted claims: **'416**:51; **'624**:6, 26; **'487**:45; **'873**:36, 71

[16] This court construed "slot" for the previous litigation for the following patents:  the '416 Patent (at issue in this case); Patent Nos. 7,099,981, 7,146,446, 7,328,297, 7,363,415, and 7,376,779 (part of the '416 family at issue in this case).

[17] "hard disk drive" appears in the following asserted claims: **'487**:38; **'961**:24; **'814**:37; **'119**:58

*See O2 Micro*, 521 F.3d at 1360.

Defendants complicate and confuse the claim language, and inject ambiguity into the claims through their definition: "a device that stores data on one or more spinning, rigid magnetic disks." This construction only serves to add additional terms, such as rigid and spinning, that could be interpreted differently by different members of the jury. This does not serve the purpose of claim construction as Defendants' proposed definition is unnecessary and unhelpful.

## V.   CONCLUSION

The disputed terms of the Patents-in-Suit are not complicated. ACQIS's proposed constructions are consistent with the plain and ordinary meaning and supported by the intrinsic evidence. ACQIS thus respectfully requests that the Court adopt ACQIS's claim construction positions and reject those proposed by Defendants.

Dated:  January 5, 2015                       Respectfully submitted,


                                        */s/   James P. Brogan*

                                        James P. Brogan
                                        Wayne O. Stacy, State Bar #24008070
                                        Sarah J. Guske
                                        Peter J. Sauer (*pro hac vice*)
                                        COOLEY LLP
                                        380 Interlocken Crescent, Ste. 900
                                        Broomfield, CO  80021-8023
                                        Telephone:    (720) 566-4000
                                        Facsimile:     (720) 566-4099
                                        jbrogan@cooley.com
                                        wstacy@cooley.com
                                        psauer@cooley.com

                                        Thomas J. Friel, Jr.
                                        COOLEY LLP
                                        101 California Street, 5th Floor
                                        San Francisco, CA  94111-5800
                                        Telephone:    (415) 693-2000
                                        Facsimile:     (415) 693-2222
                                        tfriel@cooley.com

                                        George E. Chandler, State Bar #04094000
                                        gchandler@cmzlaw.net
                                        Michael K. Mathis, State Bar #24006078
                                        kmathis@cmzlaw.net
                                        W. Perry Zivley, Jr., State Bar #22280050
                                        pzivley@cmzlaw.net
                                        Chandler, Mathis & Zivley, PC
                                        945 Heights Boulevard
                                        Houston, TX 77008
                                        Telephone: (713) 739-7722
                                        Facsimile: (713) 739-0922

                                        *ATTORNEYS FOR PLAINTIFF ACQIS LLC*

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  As such, this **PLAINTIFF ACQIS LLC'S P.R. 4-5(a) OPENING CLAIM CONSTRUCTION BRIEF** was served on all counsel who are deemed to have consented to electronic service.  Local Rule CV-5(a)(3)(A).

*/s/          Peter J. Sauer*

112245776 v16

32.